## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANAND ROY, derivatively on behalf of WARNER BROS. DISCOVERY, INC., | Case No.: 1:24-cv-9856 |
| Plaintiff, | |
| v. | **DEMAND FOR JURY TRIAL** |
| DAVID M. ZASLAV, GUNNAR WIEDENFELS, LI HASLETT CHEN, RICHARD W. FISHER, PAUL A. GOULD, KENNETH W. LOWE, JOHN C. MALONE, FAZAL MERCHANT, PAULA A. PRICE, SAMUEL A. DI PIAZZA, JR., DEBRA L. LEE, and GEOFFREY Y. YANG, | |
| Defendants, | |
| and | |
| WARNER BROS. DISCOVERY, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Anand Roy ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Warner Bros. Discovery, Inc. ("Warner" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants David M. Zaslav ("Zaslav"), Gunnar Wiedenfels ("Wiedenfels"), Li Haslett Chen ("Chen"), Richard W. Fisher ("Fisher"), Paul A. Gould ("Gould"), Kenneth W. Lowe ("Lowe"), John C. Malone ("Malone"), Fazal Merchant ("Merchant"), Paula A. Price ("Price"), Samuel A. Di Piazza, Jr. ("Di Piazza"), Debra L. Lee ("Lee"), and Geoffrey Y. Yang ("Yang") (collectively, the "Individual Defendants," and together

with Warner, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Warner, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Zaslav and Wiedenfels for contribution under Section 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Warner, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 23, 2024 through August 7, 2024, both dates inclusive (the "Relevant Period").

2.      Warner represents itself to be "a premier global media and entertainment company that provides audiences with a differentiated portfolio of content, brands and franchises across television, film, streaming, and gaming."[1] Some of the Company's brands and franchises include Warner Bros. Motion Picture Group, Warner Bros. Television Group, DC, HBO, HBO Max, Max,

---

[1] https://www.sec.gov/ix?doc=/Archives/edgar/data/1437107/000143710724000017/wbd-20231231.htm

discovery+, CNN, Discovery Channel, HGTV, Food Network, TNT Sports, TBS, TLC, OWN, Warner Bros. Games, Batman, Superman, Wonder Woman, Harry Potter, Looney Tunes, Hanna-Barbera, Game of Thrones, and The Lord of the Rings.

3.     On April 8, 2022, Discovery, Inc. ("Discovery") closed its merger (the "Merger") with WarnerMedia Business ("WM") of AT&T Inc. and changed its name to Warner Bros. Discovery, Inc. On April 11, 2022, Warner's shares began trading on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "WBD."

4.     Warner operates through numerous reportable segments, including its Networks segment, which includes primarily the Company's international and domestic television networks. One of the Company's television networks is TNT Sports ("TNT"), which has substantially depended on basketball programming to increase ratings and revenue since 1988, specifically through its U.S. sports rights agreements with the National Basketball Association ("NBA"). TNT had an existing deal with the NBA whereby TNT paid an annual average fee of $1.2 billion.

5.     In 2024, the NBA began discussing a new round of media-rights deals that would last approximately a decade with various of the NBA's partners. Notably, Warner failed to reach a new deal with the NBA prior to its exclusive negotiating window expiring in April 2024. In turn, this allowed the NBA to negotiate with other companies for its sports rights content, including NBC, which offered to pay an annual average fee of $2.5 billion, and Amason, which offered to pay an annual average fee of $1.8 billion.

6.     During the Relevant Period, the Individual Defendants breached their fiduciary duties as officers and directors of the Company by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully

or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the sports rights negotiations Warner had with the NBA were causing, or were likely to cause, Warner to substantially reevaluate its business and goodwill; (2) the Company's goodwill in its Networks segment had substantially lessened due to the difference between Warner's market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA; (3) due to the foregoing, Warner's likelihood of incurring billions of dollars in goodwill impairment charges significantly increased; and (4) as a result, the Defendants had overstated the Company's overall financial and business prospects. As a result of the foregoing, Warner's public statements were materially false and misleading at all relevant times.

7.    The truth emerged during after-market hours on August 7, 2024 when the Company published a press release announcing its financial results for the second quarter of 2024. The Company reported, *inter alia*, disappointing revenue of $9.71 billion, which represented a 6.3% Y/Y decrease and missed consensus estimates by $360 million. Warner also reported a net loss of approximately ***$10 billion***, which resulted from a $9.1 billion non-cash goodwill impairment from the Company's Networks segment and $2.1 billion in other one-time accounting effects.[2]

8.    On this news, the price of the Company's common stock fell $0.69 per share, or approximately 8.95%, from a closing price of $7.71 per share on August 7, 2024 to close at $7.02 per share on August 8, 2024.

9.    Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

---

[2] All emphasis has been added unless otherwise noted herein.

10.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

11.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO")/President, and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

12.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of their collective engagement in fraud, of the substantial likelihood of the directors' liability in this derivative action, of the CEO's/President's, the CFO's, and the Company's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the

Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

17.      Plaintiff is a current shareholder of Warner. Plaintiff has continuously owned Company common stock at all relevant times.

### Nominal Defendant Warner

18.      Warner is a Delaware corporation with its principal executive offices at 230 Park Avenue South, New York, New York 10003. Warner's common stock trades on the NASDAQ under the ticker symbol "WBD."

### Defendant Zaslav

19.      Defendant Zaslav has served as a Company director since 2008 and as the Company's CEO and President since the closing of the Merger on April 8, 2022. Prior to the closing of the Merger, he served as Discovery's President and CEO from January 2007 until April

6

2022. According to the Schedule 14A the Company filed with the SEC on April 19, 2024 (the "2024 Proxy Statement"), as of April 4, 2024, Defendant Zaslav beneficially owned 19,810,999 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $8.44, Defendant Zaslav owned approximately $167.2 million worth of Warner stock as of that date.

20.    For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Zaslav received $49,702,546 in total compensation from the Company. This included $3,000,000 in salary, $23,078,769 in stock awards, $22,000,000 in non-equity incentive plan compensation, and $1,623,777 in all other compensation.

21.    The 2024 Proxy Statement stated the following about Defendant Zaslav:

**Professional Experience**

David M. Zaslav has served as our President and Chief Executive Officer since the closing of the WarnerMedia Transaction on April 8, 2022. Prior to the closing, Mr. Zaslav served as Discovery, Inc.'s President and Chief Executive Officer from January 2007 until April 2022. Previously, Mr. Zaslav served as President, Cable & Domestic Television and New Media Distribution of NBC Universal, Inc. ("NBC"), a media and entertainment company, from May 2006 to December 2006. Mr. Zaslav served as Executive Vice President of NBC, and President of NBC Cable, a division of NBC, from 1999 to May 2006.

**Qualifications and Expertise Provided to Our Board**

As Chief Executive Officer, Mr. Zaslav sets our goals and strategies and oversees all global operations for WBD. Under his leadership, Discovery, Inc. grew into a Fortune 500 public company with world-class brands and networks. Mr. Zaslav conceived, initiated and led the negotiation, signing and closing of the transformational WarnerMedia Transaction to create Warner Bros. Discovery. His ability as director to add his views and insights, which are focused on strategic growth and operational efficiency, to our Board's deliberations is of significant benefit to our Board.

**<u>Defendant Wiedenfels</u>**

22.    Defendant Wiedenfels has served as the Company's CFO since the closing of the

Merger and previously served as Discovery's CFO from April 2017 until the closing of the Merger. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Wiedenfels beneficially owned 954,273 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $8.44, Defendant Wiedenfels owned approximately $8 million worth of Warner stock as of that date.

23.    For the 2023 Fiscal Year, Defendant Wiedenfels received $17,056,970 in total compensation from the Company. This included $2,049,154 in salary, $8,357,236 in stock awards, $2,073,019 in option awards, $4,551,770 in non-equity incentive plan compensation, and $25,791 in all other compensation.

24.    The Company's website states the following about Defendant Wiedenfels:

Gunnar Wiedenfels serves as Chief Financial Officer of Warner Bros. Discovery, responsible for overseeing the company's global financial functions and strategies, including FP&A, accounting, internal audit, treasury, tax, procurement, and investor relations activities. In addition, Wiedenfels has oversight of the company's global business services, enterprise technical, facilities, studio, tours and retail operations.

Before the Discovery-WarnerMedia merger in April 2022, Wiedenfels served as Chief Financial Officer, Discovery, Inc., where he was a key architect of Discovery's agreement with AT&T to create a premier, standalone global entertainment company – Warner Bros. Discovery – via combining WarnerMedia's premium entertainment assets with Discovery's leading nonfiction, international entertainment, and sports businesses.

Prior to joining Discovery in 2017, Wiedenfels spent seven years in executive management roles at ProSiebenSat.1 Media SE in Munich, Germany. During his time as its CFO, he was responsible for the broadcaster outperforming analyst expectations and strong shareholder value creation.

Wiedenfels serves on the SAP SE Supervisory Board and as Chairman on its Nomination Committee. He studied Business Informatics in Mannheim and received his Ph.D. from the RWTH Aachen University, both in Germany.

**Defendant Chen**

25.    Defendant Chen has served as a Company director since 2022. She also serves as

a member of the Nominating and Corporate Governance Committee (the "Governance Committee"). According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Chen beneficially owned 16,345 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $8.44, Defendant Chen owned approximately $137,952 worth of Warner stock as of that date.

26.    For the 2023 Fiscal Year, Defendant Chen received $354,186 in total compensation from the Company. This included $135,000 in fees earned or paid in cash and $219,186 in stock awards.

27.    The 2024 Proxy Statement stated the following about Defendant Chen:

**Professional Experience**

Li Haslett Chen is the founder and chief executive officer of Howl, a technology platform that democratizes access to retail's next frontier - social commerce. For creators on platforms like YouTube, TikTok, and Instagram, Howl provides the foundation to get paid for selling products from global brands. Under her leadership, Howl has been named one of Fast Company's Most Innovative Companies and one of the Most Promising AI Companies by Forbes. Ms. Chen has been recognized as a Retail Disruptor by The Financial Times, a World Economic Forum Technology Pioneer, and included on Ad Age's 40-Under-40.

**Qualifications and Expertise Provided to Our Board**

Ms. Chen is skilled in digital interactions in the content and e-commerce spaces, as well as in technology and product development. She also brings significant experience with direct-to-consumer platforms to the WBD Board.

**Defendant Di Piazza**

28.    Defendant Di Piazza has served as a Company director since 2022. He also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Di Piazza beneficially owned 24,540 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $8.44, Defendant Di Piazza owned approximately $207,118 worth of Warner stock as of that

date.

29.     For the 2023 Fiscal Year, Defendant Di Piazza received $534,207 in total compensation from the Company. This included $315,000 in fees earned or paid in cash and $219,207 in stock awards.

30.     The 2024 Proxy Statement stated the following about Defendant Di Piazza:

**Professional Experience**

Samuel A. Di Piazza, Jr. served as Global Chief Executive Officer of PricewaterhouseCoopers International Limited from 2002 until his retirement in 2009. Mr. Di Piazza began his 36-year career with PricewaterhouseCoopers (PwC, formerly Coopers & Lybrand) in 1973 and was named Partner in 1979 and Senior Partner in 2000. From 1979 to 2002, Mr. Di Piazza held various regional leadership positions with PwC. After his retirement from PwC, Mr. Di Piazza joined Citigroup where he served as Vice Chairman of the Global Corporate and Investment Bank from 2011 until 2014.

**Qualifications and Expertise Provided to Our Board**

Mr. Di Piazza brings significant executive and business leadership to our Board through his management of a multicultural, complex professional services organization serving clients around the world. He has significant global accounting, cyber and financial experience, and extensive knowledge of the entertainment business, including from his prior service on the boards of DirecTV and AT&T.

**Defendant Fisher**

31.     Defendant Fisher has served as a Company director since 2022. He also serves as a member of the Compensation Committee and the Governance Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Fisher beneficially owned 18,764 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $8.44, Defendant Fisher owned approximately $158,368 worth of Warner stock as of that date.

32.     For the 2023 Fiscal Year, Defendant Fisher received $379,186 in total compensation from the Company. This included $150,000 in fees earned or paid in cash, $219,186

in stock awards, and $10,000 in all other compensation.

33.    The 2024 Proxy Statement stated the following about Defendant Fisher:

**Professional Experience**

Richard W. Fisher served as President and Chief Executive Officer of the Federal Reserve Bank of Dallas from 2005 until March 2015. He served as a Senior Advisor to Barclays PLC from 2015 until March 2024, and began serving as a Senior Advisor to Jefferies in April of 2024. From 2001 to 2005, Mr. Fisher was Vice Chairman and Managing Partner of Kissinger McLarty Associates. From 1997 to 2001, Mr. Fisher served as Deputy U.S. Trade Representative with the rank of Ambassador. Previously, he served as Managing Partner of Fisher Capital Management and Fisher Ewing Partners LP (investment advisory firms) and prior to that was Senior Manager of Brown Brothers Harriman & Co. From 2015 to 2021, Mr. Fisher served as a director at PepsiCo and he currently serves on the Audit committee of Tenet Healthcare, where he has been a director since 2017.

**Qualifications and Expertise Provided to Our Board**

Mr. Fisher has extensive knowledge of financial matters and expertise in international markets, trade and regulatory frameworks. He brings to our Board strategy, leadership and risk oversight experience, including his prior experience chairing a Federal Reserve committee on information technology architecture and cybersecurity risks for five years.

**Defendant Gould**

34.    Defendant Gould has served as a Company director since 2008. He previously served as a director of Discovery Holding Company from 2005 to 2008 when it merged with Discovery. Defendant Gould also serves as Chair of the Compensation Committee and as a member of the Governance Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Gould beneficially owned 717,198 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $8.44, Defendant Gould owned approximately $6 million worth of Warner stock as of that date.

35.    For the 2023 Fiscal Year, Defendant Gould received $389,186 in total

compensation from the Company. This included $170,000 in fees earned or paid in cash and $219,186 in stock awards.

36.     The 2024 Proxy Statement stated the following about Defendant Gould:

**Professional Experience**

Paul A. Gould served as a director of Discovery Holding Company from 2005 to 2008 when it merged with Discovery, Inc. Mr. Gould has served at Allen & Company Incorporated, an investment banking services company, since 1972, including as a Managing Director and Executive Vice President for more than the last five years. He is also a member of an International Monetary Fund advisory committee, and a long-serving board member of the Wildlife Conservation Society, where he has chaired the investment committee since 2017. Mr. Gould has served as a financial advisor to many Fortune 500 corporations and advised on a number of large media company acquisitions. Since 2020, Mr. Gould has served as a director of Radius Global Infrastructure, Inc., which ceased to be a public company in 2023.

**Qualifications and Expertise Provided to Our Board**

Mr. Gould brings to our Board a wealth of experience in matters relating to public company finance and mergers and acquisitions, particularly in the media and entertainment industries. Mr. Gould's knowledge of our Company and our industry, combined with his expertise in finance, makes him an important part of our Board.

**Defendant Lee**

37.     Defendant Lee has served as a Company director since 2022. She also serves as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Lee beneficially owned 16,345 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $8.44, Defendant Lee owned approximately $137,952 worth of Warner stock as of that date.

38.     For the 2023 Fiscal Year, Defendant Lee received $359,186 in total compensation from the Company. This included $140,000 in fees earned or paid in cash and $219,186 in stock awards.

39.     The 2024 Proxy Statement stated the following about Defendant Lee:

**Professional Experience**

Debra L. Lee is Chair of Leading Women Defined Foundation (a nonprofit education and advocacy organization in Los Angeles, California), which she founded in 2009. She has served in this capacity since June 2018. Ms. Lee also co-founded The Monarchs Collective (a management consulting firm in Los Angeles, California), where she has served as a partner since 2020. Ms. Lee served as Chairman and Chief Executive Officer of BET Networks (a global media and entertainment subsidiary of Viacom, Inc., headquartered in New York, New York) from 2006 until her retirement in 2018. Ms. Lee joined BET Networks in 1986 and served in several leadership roles, including President and Chief Executive Officer (2005-2006), President and Chief Operating Officer (1995-2005), and Executive Vice President and General Counsel (1986-1995).

**Qualifications and Expertise Provided to Our Board**

Ms. Lee brings a depth of executive management, strategy, and risk management experience to the Board, gained through her long-tenured leadership of BET Networks and her service on numerous other public company boards. As a result of her experience and service, her depth and breadth of knowledge on matters of corporate governance allows her to provide the Board with valuable perspective on oversight and accountability in a dynamic operating environment. Further, Ms. Lee's more than 30 years of experience as an executive in the media industry, along with her broad board experience in consumer-facing brands are particularly valuable to the WBD Board.

**Defendant Lowe**

40.    Defendant Lowe has served as a Company director since 2023 and previously served as a Company director from 2018 to 2022. He also serves as a member of the Audit Committee and the Compensation Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Lowe beneficially owned 1,051,134 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $8.44, Defendant Lowe owned approximately $8.9 million worth of Warner stock as of that date.

41.    For the 2023 Fiscal Year, Defendant Lowe received $342,936 in total compensation from the Company. This included $123,750 in fees earned or paid in cash and

$219,186 in stock awards.

42.    The 2024 Proxy Statement stated the following about Defendant Lowe:

**Professional Experience**

Kenneth W. Lowe served as Chairman, President and Chief Executive Officer of Scripps Networks Interactive, Inc. ("Scripps Networks") from 2008 until 2018, when Scripps Networks merged with Discovery, Inc. From 2000-2008, Mr. Lowe served as President and Chief Executive Officer of The E.W. Scripps Company. Prior to 2000, Mr. Lowe was Chairman and CEO of Scripps Networks.

**Qualifications and Expertise Provided to Our Board**

Through his experience as a media executive and his extensive experience with Scripps Networks, Mr. Lowe has developed a deep understanding of our industry. Mr. Lowe has a proven track record of building content and lifestyle brands as well as integrating and growing global media companies. Mr. Lowe's expertise in the media industry, experience as a public company executive, and prior experience on the Discovery board during a period of transformation following the Scripps Networks acquisition makes him a valued addition to the WBD Board.

**Defendant Malone**

43.    Defendant Malone has served as a Company director since 2008. He previously served as CEO and Chairman of the Board of Discovery Holding Company from 2005 to 2008, when it merged with Discovery. Defendant Malone also serves as Chair of the Governance Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Malone beneficially owned 19,080,709 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $8.44, Defendant Malone owned approximately $161 million worth of Warner stock as of that date.

44.    For the 2023 Fiscal Year, Defendant Malone received $361,686 in total compensation from the Company. This included $142,500 in fees earned or paid in cash and $219,186 in stock awards.

45.    The 2024 Proxy Statement stated the following about Defendant Malone:

**Professional Experience**

John C. Malone served as Chief Executive Officer and Chairman of the Board of Discovery Holding Company from 2005 to 2008, when it merged with Discovery, Inc. Mr. Malone is currently chairman of the boards of Liberty Media Corporation, Liberty Broadband Corporation and Liberty Global Ltd. His extensive experience includes serving as chief executive officer of Telecommunications Inc. for over 25 years until its merger with AT&T Corporation in 1999.

**Qualifications and Expertise Provided to Our Board**

Mr. Malone has played a pivotal role in the cable television industry since its inception and is considered one of the preeminent figures in the media and telecommunications industry. Mr. Malone brings to our Board his well-known sophisticated problem solving and risk assessment skills. His breadth of industry knowledge and unique perspective on our business make him an invaluable member of our Board. He also brings extensive experience serving on other public company boards and boards of non-profit organizations within the cable industry, including Cable Television Laboratories, Inc. and the National Cable Television Association.

### Defendant Merchant

46.     Defendant Merchant has served as a Company director since 2022. He also serves as a member of the Audit Committee and the Governance Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Merchant beneficially owned 51,106 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $8.44, Defendant Merchant owned approximately $431,335 worth of Warner stock as of that date.

47.     For the 2023 Fiscal Year, Defendant Merchant received $374,222 in total compensation from the Company. This included $155,000 in fees earned or paid in cash and $219,222 in stock awards.

48.     The 2024 Proxy Statement stated the following about Defendant Merchant:

**Professional Experience**

Fazal Merchant is currently a Senior Advisor to Sixth Street Partners and various media and technology related endeavors, and a member of the board of directors at Ryman

Hospitality Properties and Ariel Investments. He retired in 2020 as Co-CEO of Tanium Inc., a subscription-based global cybersecurity and IT management company, which he joined in 2017 as COO & CFO and was appointed Co-CEO in May 2019 and served as a board member from June 2019 until February 2022. Prior to joining Tanium, Mr. Merchant was CFO of DreamWorks Animation SKG (2014-2016) and he served in several executive roles at DirecTV, including SVP Corporate Development, Corporate Treasurer, and CFO of Latin America (2012-2014). Earlier in his career, Mr. Merchant spent over 8 years in investment banking at Barclays Capital and RBS, and he began his career at Ford Motor Company.

**Qualifications and Expertise Provided to Our Board**

Mr. Merchant brings extensive business experience in senior leadership positions with involvement in and oversight of technology, strategy, financial reporting and controls, marketing, sales and capital markets. In addition, Mr. Merchant's experience as chief financial officer of multiple companies provides our Board with extensive financial acumen and experience. Mr. Merchant also brings valuable experience with respect to media and technology.

**<u>Defendant Price</u>**

49.     Defendant Price has served as a Company director since 2022. She also serves as Chair of the Audit Committee.

50.     For the 2023 Fiscal Year, Defendant Price received $399,186 in total compensation from the Company. This included $160,000 in fees earned or paid in cash, $219,186 in stock awards, and $20,000 in all other compensation.

51.     The 2024 Proxy Statement stated the following about Defendant Price:

**Professional Experience**

From July 2018 through May 2020, Paula A. Price was the executive vice president and chief financial officer of Macy's, Inc., an omni-channel retailer of apparel, accessories and other goods, and she continued to serve as its strategic advisor until November 2020. From 2014 to 2018, she was a full-time senior lecturer at Harvard Business School. Prior to joining the faculty of Harvard Business School, she was executive vice president and chief financial officer of Ahold USA, a U.S. grocery retailer, which she joined in 2009. Prior to joining Ahold USA, Ms. Price was senior vice president, controller and chief accounting officer at CVS Caremark. Earlier in her career, Ms. Price was the chief financial officer of the Institutional Trust Services division of JPMorgan Chase & Co. and also held senior management positions at Prudential Insurance Co. of America, Diageo and Kraft Foods. A

16

certified public accountant, she began her career at Arthur Andersen & Co.

**Qualifications and Expertise Provided to Our Board**

Ms. Price brings to the WBD Board broad experience across finance, general management and strategy gained from her service in senior executive and management positions at major corporations across several industries, including, in particular, the retail, financial services and consumer packaged goods industries. She brings to the Board an important perspective from her experience as a chief financial officer, a member of the faculty of Harvard Business School and from her service as a director of other public company boards. The Board also benefits from her extensive background and expertise in finance and accounting matters.

**<u>Defendant Yang</u>**

52.     Defendant Yang has served as a Company director since 2022. He also serves as a member of the Compensation Committee. According to the 2024 Proxy Statement, as of April 4, 2024, Defendant Yang beneficially owned 149,361 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on April 4, 2024 was $8.44, Defendant Yang owned approximately $1.3 million worth of Warner stock as of that date.

53.     For the 2023 Fiscal Year, Defendant Yang received $364,198 in total compensation from the Company. This included $145,000 in fees earned or paid in cash and $219,198 in stock awards.

54.     The 2024 Proxy Statement stated the following about Defendant Yang:

**Professional Experience**

Geoffrey Y. Yang is a founding partner and Managing Director of Redpoint Ventures (a global private equity and venture capital firm based in Woodside, California) ("Redpoint") and has served in this capacity since 1999. He also founded Performance Health Sciences (d/b/a Apeiron Life), located in Menlo Park, California, where he has served as Chief Executive Officer and a member of its board of directors since April 2018. He is cofounder and CEO of The Odds, LLC, a seed stage company founded in 2022, and cofounder, director and former CEO of Sake Ono, LLC, a seed stage company formed in 2022. Prior to founding Redpoint, Mr. Yang was a General Partner with Institutional Venture Partners (a private equity investment firm in Menlo Park, California), which he joined in 1987. Mr.

Yang has over 35 years of experience in the venture capital industry and has helped found or served on the boards of a variety of consumer media, internet, and infrastructure companies.

**Qualifications and Expertise Provided to Our Board**

Mr. Yang has extensive experience in technology and innovative forms of digital media and advertising. He has helped to found, invest in, and provide strategic guidance to communications infrastructure and consumer media and entertainment companies internationally.

## <u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>

55.     By reason of their positions as officers, directors, and/or fiduciaries of Warner and because of their ability to control the business and corporate affairs of Warner, the Individual Defendants owed Warner and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Warner in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Warner and its shareholders so as to benefit all shareholders equally.

56.     Each director and officer of the Company owes to Warner and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

57.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Warner, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

58.     To discharge their duties, the officers and directors of Warner were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

59.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Warner, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Warner's Board at all relevant times.

60.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

61. To discharge their duties, the officers and directors of Warner were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Warner were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to Warner's own Code of Ethics (the "Code of Conduct");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Warner conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Warner and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Warner's operations would comply with all applicable laws and Warner's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was

required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

62.    Each of the Individual Defendants further owed to Warner and the shareholders the duty of loyalty requiring that each favor Warner's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

63.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Warner and were at all times acting within the course and scope of such agency.

64.    Because of their advisory, executive, managerial, directorial, and controlling positions with Warner, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

65.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Warner.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

66.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants

caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

67.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

68.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Warner was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

69.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

70.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Warner and was at all times acting within the course and scope of such agency.

## WARNER'S CODE OF CONDUCT

71.    Warner's Code of Conduct states that it "applies to all directors, officers, executives and employees of Warner Bros. Discovery and its subsidiaries around the world, including joint ventures that are subject to it. It applies everywhere we do business and any time anybody represents the Company."

72.    The Code of Conduct states that its purpose is as follows:

Purpose and Overview

INTEGRITY MATTERS.

When we conduct business ethically, we send a message to our consumers, business partners, shareholders and other stakeholders that they can put their trust in us. By doing the right thing, we not only protect our reputation, but we also help Warner Bros. Discovery, Inc. ("Warner Bros. Discovery" or "the Company") thrive.

To that end, we have created this Code of Ethics ("Code"). It provides standards for: ensuring compliance with applicable laws, regulations and Company policies; promoting integrity and the highest standards of ethical conduct; and helping us avoid even the appearance of anything improper in our business activities.

73.    In the section "Communicating with the Public," the Code of Conduct states the following, in relevant part:

We are committed to maintaining honest, professional and lawful internal and public communications and recognize the need for a consistent voice when issuing statements about the Company or providing information to the public. For this reason, it is important that only authorized persons speak on behalf of Warner Bros. Discovery. Communications with media, investors, stock analysts and other members of the financial community should be referred to Corporate Communications and/or Investor Relations.

Full, Fair and Timely Disclosures

As a public company, we are committed to meeting our obligations of full, fair and timely disclosure in all reports and documents that describe our business and financial results, and other public communications.

74.    Under the heading "Insider Trading," the Code of Conduct states the following, in relevant part:

In the course of business, you may learn confidential information about the Company or about other publicly traded companies that is not available to the public. Don't share material nonpublic information with anyone, including coworkers (unless it is essential for Company-related business), friends or family. Buying or selling the stock of a publicly traded company while aware of material nonpublic information, or sharing such information with others who then buy or sell the stock ("tipping"), is prohibited by various laws, and even casual conversations could be viewed as illegal "tipping" of inside information.

**Material information** is the kind of information a reasonable investor would take into consideration when deciding whether to buy, sell or hold a stock.

75.    Under the heading "Integrity of Financial Records and Public Disclosure," the Code of Conduct states the following, in relevant part:

Our financial records serve as a basis for managing our business and fulfilling our responsibilities to shareholders, our employees and other stakeholders. The integrity of our financial records is also important to our compliance with accounting, tax and public disclosure laws and regulations and other requirements.

We are committed to maintaining accurate and complete financial records and to full, fair, accurate, timely and understandable disclosure in reports and documents that are filed with the U.S. Securities and Exchange Commission and other regulatory bodies or are otherwise made publicly available.

Individually, we are all responsible for recording clear, accurate and honest information in all Company records that we produce, such as expense reports, financial statements and public disclosure documents.

If you have any concerns about questionable accounting or audit matters, you should immediately contact the Ethics & Compliance Office or Internal Audit. You may submit your concerns anonymously where permitted by law. It is essential for the Company to learn about possible accounting or audit concerns so we can investigate them promptly. When in doubt, speak up. The Company does not tolerate any acts of retaliation for good faith reports of accounting or audit concerns.

76.    In the section "Complying with Laws and Regulations," the Code of Conduct

states:

> Complying with the law is the minimum standard for ethical conduct and we are
> committed to full compliance with all laws and regulations that apply to our
> business. It is, however, impossible to anticipate every situation that might arise in
> the course of your day-to-day business activities. Therefore, the Code includes
> additional resources that are available to you as questions arise. As an employee, it
> is up to you to use good judgment and to seek help when necessary. If any provision
> of the Code conflicts with a local law or requirement, you should seek guidance
> from your People & Culture partner or the Ethics & Compliance Office.

77.    In the section "Asking Questions and Reporting Concerns," the Code of Conduct

states:

> An issue cannot be addressed unless it is brought to someone's attention. It is
> therefore incumbent upon each of us to seek guidance when "the right thing to do"
> is unclear and to report legal or ethical concerns when they arise.
>
> Your manager is a good starting point for any questions or concerns you might have
> about the Code or other Company policies. However, if you're uncomfortable
> speaking with your manager for any reason, you should:
>
> • Contact another member of management (and it does not have to be someone in
> your direct line of reporting);
> • Contact your People & Culture partner;
> • Contact the Ethics & Compliance Office; and/or
> • Call the ethics hotline (the "Hotline") toll-free at 800-398-6395 or access the
> Hotline website (wbd.ethicspoint.com). The Hotline website lists toll-free numbers
> for all locations in which the Company has offices. Anonymous reports will be
> accepted where permitted by law.
>
> The Company will make every reasonable attempt to ensure that your concerns are
> addressed appropriately. Reports from employees outside the U.S. may be subject
> to the laws of the country in which the employee works. The Company will handle
> all reports, including anonymous reports, in accordance with local privacy
> regulations and other applicable laws.

78.    In violation of the Code of Conduct, the Individual Defendants conducted little, if

any, oversight of the Company's engagement in the Individual Defendants' scheme to issue

materially false and misleading statements to the public and to facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse

of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also,

in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls,

failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of

Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical

manner, and properly report violations of the Code of Conduct.

## **WARNER'S AUDIT COMMITTEE CHARTER**

79.    The Company also maintains an Audit Committee Charter (the "Audit Committee

Charter"). According to the Audit Committee Charter, the purpose of the Audit Committee is as

follows:

> The purpose of the Audit Committee as set forth in this charter (the "Charter") is to
> provide assistance to the Board in fulfilling the Board's responsibilities to the
> Company and its stockholders relating to the accounting, financial reporting
> process, internal controls and the audit of the Company's financial statements. The
> Audit Committee will generally oversee management's processes and activities
> relating to:
> • maintaining the reliability and integrity of the Company's accounting policies,
> internal controls, financial reporting practices and financial statements;
> • the independent auditor's qualifications and independence;
> • the performance of the Company's internal audit function and independent
> auditor; and
> • confirming compliance with U.S. Federal securities laws and regulations, and the
> requirements of any stock exchange or quotation system on which the Company's
> securities
> may be listed.

80.    Within the subheading "Financial Statement and Disclosure Matters," the Audit

Committee Charter states the following, in relevant part:

> F. Audited Financial Statements. The Committee shall review and discuss with
> management and the independent auditor the Company's annual audited financial
> statements, including disclosures made in "Management's Discussion and Analysis
> of Financial Condition and Results of Operations" and the results of the
> independent auditor's review of the annual audited financial statements, and
> recommend to the Board whether the audited financial statements should be

included in the Company's Form 10-K.

G. Interim Financial Statements. The Committee shall review and discuss with management and the independent auditor the Company's quarterly financial statements, including disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of the Company's Forms 10-Q, including the results of the independent auditor's review of the quarterly financial statements.

H. Review of Financial Disclosures. The Committee shall review and discuss with management and the independent auditor, as applicable, (A) significant issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies; (B) analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative generally accepted accounting principles ("GAAP") methods on the financial statements; (C) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company; (D) any other financial disclosures prior to their release in the Company's Form 10-K or Forms 10-Q to determine that management and the independent auditor are satisfied with the disclosure and content of the financial statements to be presented; and (E) earnings press releases as well as financial information and earnings guidance (generally or on a case-by-case basis) provided to analysts and rating agencies.

I. Review of Independent Auditor Reports. The Committee shall, at least quarterly, review and discuss reports from the independent auditor on (A) all critical accounting policies and practices to be used;(B) all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and treatments preferred by the independent auditor; and (C) other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

J. Audit Committee Report. The Committee shall prepare the Audit Committee report required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement.

81.      Within the subheading "Controls and Procedures," the Audit Committee Charter

states the following, in relevant part:

K. Risk Management. The Committee shall discuss with management the Company's significant business risk exposures including those related to (i)

27

financial reporting and accounting risk, (ii) legal and regulatory risk, (iii) cybersecurity and information technology risk, and (iv) the steps management has taken to monitor and control such risk exposures, including the Company's risk assessment and risk management policies or guidelines. As appropriate, the Committee shall review such matters with the Board.

L. Review of Conduct of Audit. The Committee shall review and discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 (Codification of Statements on Auditing Standards, AU § 380, as amended) relating to the conduct of the audit or any review services, including any difficulties encountered in the course of the audit or review work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

M. Certifications. The Committee shall review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10- K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

82.     Under the subheading titled "Compliance Oversight Responsibilities," the Audit Committee Charter states the following, in relevant part:

U. Code of Ethics. The Committee shall periodically review the Company's Code of Ethics (the "Code"), reassess its adequacy and recommend any proposed changes to the Board for approval.

V. Procedures for Complaints. The Committee shall establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or audit matters, (ii) the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters, (iii) ) the review of any reports of the independent auditor mandated by Section 10A of the Exchange Act and the obtainment from the independent auditor of any information with respect to illegal acts in accordance with Section 10A; (iv) the review, discussion and treatment of any reports concerning material violations submitted by Company attorneys or outside counsel; and (v) the review and oversight of compliance with, and the establishment of procedures for, the treatment of alleged violations of the Code, waivers of provisions of the Code and reporting and disclosure of such violations and waivers.

83.     In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the

28

Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### False and Misleading Statements

#### *February 23, 2024 Press Release*

84.    On February 23, 2024, during pre-market hours, the Company published a press release announcing its financial results for the fourth quarter ("4Q23") and full 2023 Fiscal Year (the "4Q/2023 Press Release"). Defendant Zaslav, the Company's CEO, was quoted in the 4Q/2023 Press Release as stating that Defendants had allegedly "execut[ed] against [their] strategic plan to reposition the company," were "now on solid footing with a clear pathway to growth," and "ha[d] an attack plan for 2024 that includes . . . further progress against [their] long-range financial goals" such that Defendants "[we]re confident in [their] ability to drive sustained operating momentum and enhanced shareholder value."

85.    Regarding the Company's Networks segment, the 4Q/2023 Press Release stated the following, in relevant part:

> · Networks operating expenses decreased 7% ex-FX[1] to $2,829 million compared to the prior year quarter. The AT&T SportsNet business exit favorably impacted the year-over-year growth rate by approximately 300 bps[.]

· Costs of revenues decreased 7% ex-FX, primarily driven by lower international sports rights fees, including the transfer of TNT Sports Chile, exiting the AT&T SportsNet business, as well as lower domestic general entertainment content expense, partially offset by the impact of inflation in Argentina.

SG&A [selling, general, and administrative] expenses decreased 4% ex-FX, primarily driven by lower personnel expenses.

86.     The same day, the Company held an earnings call with analysts and investors to discuss its 4Q23 and full 2023 Fiscal Year financial results (the "4Q/2023 Earnings Call"). During the call, Defendant Zaslav represented, among other things, that "[o]ur top priority this year was to get this company on solid footing and on a pathway to growth, and we've done that"; that "[w]e've significantly enhanced the efficiency of the organization with a long runway still to go"; that "[w]e are optimistic that the efforts we've undertaken on digital and advanced advertising solutions . . . will enable us to achieve a more competitive profile"; and that, "[b]ottom line, we're a far healthier company now," "we're building real momentum," "[a]nd we expect 2024 will be a year to drive that momentum forward even further" notwithstanding "the impacts of ongoing disruption in the pay-TV ecosystem and a dislocated linear advertising ecosystem."

87.     Regarding the NBA and its content, Defendant Zaslav stated the following, in relevant part:

Last weekend we saw great coverage and strong ratings at the NBA All-Star Game and All-Star Weekend. We have a strong positive 40-year relationship with the NBA. And in terms of our NBA rights, we are now fully engaged in renewal discussions, and they are constructive and productive. Our global sports portfolio continues to provide real meaningful value to all of our platforms. We're proud to be the home of one of the most coveted collections of premium sports content in the industry, along with a best-in-class talent roster and exceptional production values.

88.     Later, during the question-and-answer ("Q&A") portion of the call, an analyst commented that it was "great news to hear [the positive news regarding] the NBA conversations," which "[c]learly . . . would be a big positive to retain those rights," and asked "[h]ow do you think

about making that work financially for the company" given "that linear TV is under pressure on the revenue side, and I think it's probably safe to say the NBA costs are going to go up," and "how do you guys approach this from a kind of a P&L [profit and loss] point of view when you think about exploiting the NBA for what I imagine will be another long-term deal?" In response, Defendant Wiedenfels stated the following, in relevant part:

> [O]n the NBA, as you know, we're in the middle of exclusive discussions here, so I want to lift it up maybe one level to a general statement on how we look at sports rights. We're spending close to $20 billion sort of, on content and programming in the broadest sense, and every dollar we spend plays a different role across the portfolio. We generally like to own our content. That's not the case with sports, but we obviously acknowledge the enormous value, reach value, emotional value of these deals. And we have been able to strike profitable deals and we're always going to be disciplined. It's very easy to lose control over sports rights investments. That's not what we do. We're going -- we know exactly what value we assign and we stay disciplined during our discussions.

> And if you take that into account, I think we have enormous opportunity to be much more efficient with our content spend overall across the entire company, and that will include certain areas in which, you're right, you probably have to assume that there is inflation going forward. On the NBA specifically, we've had a very, very strong partnership for 40 years, and I certainly hope that we're going to be able to continue that in the most positive way.

### *February 23, 2024 Form 10-K*

89.    Also on February 23, 2024, the Company filed its annual report on Form 10-K with the SEC to report its financial results for the full 2023 Fiscal Year (the "2023 10-K"). The 2023 10-K was signed by Defendants Zaslav, Wiedenfels, Chen, Di Piazza, Fisher, Gould, Lee, Lowe, Malone, Merchant, Price, and Yang. Regarding Warner's goodwill impairment analysis for 2023, the 2023 10-K stated the following, in relevant part:

*2023 Impairment Analysis*

As of October 1, 2023, the Company performed a quantitative goodwill impairment assessment for all reporting units. The estimated fair value of each reporting unit exceeded its carrying value and, therefore, no impairment was recorded . . . . [T]he Networks reporting unit, which had headroom of 5%, . . . had fair value in excess

of carrying value of less than 20%. The fair values of the reporting units were determined using a combination of DCF [discounted cash flow] and market valuation methodologies. Due to [*inter alia*] declining levels of global GDP growth, [and] soft advertising markets in the U.S. associated with the Company's Networks reporting unit . . . the Company will continue to monitor its reporting units for changes that could impact recoverability.

90.     The 2023 10-K also contained boilerplate representations regarding the Company's "invest[ment of] significant resources to acquire and maintain licenses to produce sports programming" and that "there can be no assurance that we will continue to be successful in our efforts to obtain or maintain licenses to recurring sports events or recoup our investment when the content is distributed," stating the following, in relevant part:

> We face significant competition to acquire and maintain licenses to sports programming, which leads to significant expenditure of funds and resources. As a result of an increasing number of market entrants in the programming space, we have seen upward pressure on programming costs in recent years, particularly in connection with the licensing and acquisition of sports content from third parties. We may also be impacted by such upward pressures driven by increasing investment in programming by competitors . . . . There can be no assurance that we will be able to compete successfully in the future against existing or new competitors to obtain and/or maintain licenses to recurring sports events, or that increasing competition for programming licenses . . . will not have a material adverse effect on our business, financial condition or results of operations.
>
> There can also be no assurance that we will recoup our investment in sports programming, including realizing any anticipated benefits of our joint ventures. The impact of these contracts on our results of operations over the term of the contracts depends on a number of factors, including the strength of advertising markets and subscription levels and rates for programming. Our success with sports programming is highly dependent on consumer acceptance of this content and the size of our viewing audience.

91.     The statements in the paragraph above were materially false and misleading because these risk warnings were not tailored to the Company's actual known risks with respect to its sports rights negotiations with the NBA. The risk warnings further failed to disclose that these negotiations were causing and/or were likely to cause Warner to substantially reevaluate its goodwill and business.

92.     The 2023 10-K also contained a boilerplate discussion regarding the Company's potential future "recogni[tion of] . . . impairment charges related to goodwill and other intangible assets," while at the same time downplaying the likelihood of the same. Indeed, the 2023 10-K stated, in relevant part:

> We have a significant amount of goodwill and other intangible assets on our consolidated balance sheet. In accordance with U.S. GAAP, management periodically assesses these assets to determine if they are impaired. Significant negative industry or economic trends, including the continued decline of traditional linear television viewership and linear ad[vertising] revenues, disruptions to our business, inability to effectively integrate acquired businesses, underperformance of our content, unexpected significant changes or planned changes in use of the assets, including in connection with restructuring initiatives, divestitures and market capitalization declines ***may*** impair goodwill and other intangible assets. Any charges relating to such impairments ***could*** materially adversely affect our results of operations in the periods recognized.

93.     The statements in the paragraph above were materially false and misleading because these risk warnings were not tailored to the Company's actual known risks with respect to impairments to its Networks segment's goodwill and failed to disclose that various factors (as further discussed herein) were likely to result in billions of dollars in goodwill impairment charges.

94.     In addition, attached as exhibits to the 2023 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Zaslav and Wiedenfels asserting that the 2023 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;" and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

*April 19, 2024 Proxy Statement*

95.     On April 19, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, Zaslav, Di Piazza, Lee, and Yang solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

96.     The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board; (2) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2024 (the "2024 Fiscal Year"); (3) approve, on an advisory basis, the compensation of the Company's named executive officers; and (4) approve the Amended and Restated Warner Bros. Discovery, Inc. Stock Incentive Plan (the "Plan").

97.     Regarding "Board Role in Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

> The Board has overall responsibility for overseeing risk management at WBD and has delegated functional oversight for certain risks to each of the three standing Board committees, as highlighted in the chart below. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire Board is regularly informed about such risks through committee reports and other presentations. Senior management is responsible for developing and implementing the Company's financial and strategic plans and identifying, evaluating, managing, and mitigating the risks inherent in those plans. Our Board is responsible for overseeing those plans, the associated risks, and the steps that senior management is taking to manage and mitigate risks.
>
> During 2023, in order to assess key risks, challenges and opportunities, we developed a customized enterprise risk management program, which considers financial, operational, regulatory, reputational, extended enterprise, strategic, technological and talent risks. The Audit Committee oversees the enterprise risk management program. Our Chief Audit and Risk Officer primarily leads the development and assessment of enterprise risk management processes and policies, including identifying, assessing, and reporting on risks. Our Chief Audit and Risk Officer and other members of our senior management provide updates to the Audit Committee on the enterprise risk management program.

98.     Regarding the Code of Conduct, the 2024 Proxy Statement stated the following,

in relevant part:

> We have a Code of Ethics (the "Code") that is applicable to all of our directors,
> officers and employees. Our Board reviews the Code regularly and approved an
> updated Code in January 2023. The Code, and any amendments or waivers that
> would be required to be disclosed under SEC rules, are posted to the Investor
> Relations section of our corporate website at ir.wbd.com. Printed copies of the
> Code are also available without charge upon request to the Corporate Secretary at
> the address specified below under "Stockholder Communication with Directors."
>
> ***
>
> We believe what sets us apart is our culture, built on foundational values and
> business practices, as outlined in our Code of Ethics, that promote proper conduct,
> tolerance, respect, honesty and integrity in the workplace. Our Code of Ethics is
> applicable to all of our directors, officers and employees and it is the responsibility
> of every WBD director and employee to adhere to the highest standards of ethical
> and professional behavior by acting in accordance with our Code of Ethics. Our
> Board reviews the Code regularly and approved an updated Code in January 2023.
> Our Code of Ethics covers all aspects of our business operations and sets standards
> for: ensuring compliance with applicable laws, regulations and WBD policies;
> promoting integrity and the highest standards of ethical conduct; and helping us
> avoid even the appearance of anything improper in our business activities. Among
> the subject areas covered in our Code of Ethics include guidelines for promoting a
> safe and respectful workplace, including promoting DE&I and non-discrimination
> and respect for human rights. Our Code of Ethics also addresses data privacy
> matters, including information about our customers, employees and business
> partners.
>
> We also support the right of all employees to speak out about matters of public
> concern or engage in certain activities related to the terms and conditions of their
> employment. We encourage all directors, officers and employees to act with
> integrity, to keep up-to-date on our standards and expectations and to promptly
> report concerns about conduct that may be inconsistent with the Code of Ethics, our
> policies or the law.

99.     Regarding the proposal to amend the Plan, the 2024 Proxy Statement stated the

following, in relevant part:

> At this meeting, we are asking you to approve an amendment and restatement of
> our Warner Bros. Discovery, Inc. Stock Incentive Plan (the "Plan"). The amended
> and restated version of the Plan (the "Amended and Restated Plan") was adopted
> by our Board on February 27, 2024, subject to stockholder approval as further

described below. The Amended and Restated Plan provides for the following key changes to the existing Plan:

■an increase in shares available for issuance under the Amended and Restated Plan by 125 million shares, to allow for continued use of equity incentives in attracting and retaining the best employees; and

■the addition of a one-year minimum vesting requirement for awards (other than substitute awards relating to mergers, consolidations or acquisitions) under the Amended and Restated Plan to underscore our commitment to retaining talent (except that (i) up to 5% of the maximum aggregate number of shares permitted to be issued under the Amended and Restated Plan may be granted as awards not subject to the minimum vesting requirement and (ii) in connection with a participant's death or disability or certain changes in control, awards may be automatically accelerated without regard to the minimum vesting requirement).

100.    The 2024 Proxy Statement also warned that "If our stockholders do not approve the Amended and Restated Plan, the Plan will remain in effect in accordance with its current terms. *In that event, we may not have sufficient shares to cover our annual equity award grants for calendar year 2025, and our ability to fully utilize an important compensation tool that is key to our ability to attract, motivate, reward and retain our key employees may be impaired.*"

101.    Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, Zaslav, Di Piazza, Lee, and Yang caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the sports rights negotiations Warner had with the NBA were causing, or were likely to cause, Warner to substantially reevaluate its business and goodwill; (2) the Company's goodwill in its Networks segment had substantially lessened due to the difference between Warner's market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA; (3) due to the foregoing, Warner's likelihood of incurring billions of dollars in goodwill impairment charges significantly increased; and (4) as a result, the Defendants had overstated the Company's overall financial and business prospects. As a result of the foregoing, Warner's public

statements were materially false and misleading at all relevant times.

102.    The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

103.    As a result of Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, Zaslav, Di Piazza, Lee, and Yang causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve, on an advisory basis, the compensation of the Company's named executive officers; and (4) approve the Plan.

### *April 22, 2024 Exclusive Sports Rights Negotiating Window Expires*

104.    On April 22, 2024, the exclusive sports rights negotiating window that the Company had with the NBA expired without a deal. Notably, this allowed the NBA to negotiate for its sports rights content with other companies, including NBC, among others, which offered to pay an annual average fee of $2.5 billion, and Amazon, which offered to pay an annual average fee of $1.8 billion.

### *May 9, 2024 Press Release*

105.    On May 9, 2024, the Company published a press release announcing its financial results for the first quarter of the 2024 Fiscal Year ("1Q24") (the "1Q24 Press Release"). Defendant Zaslav was quoted in the 1Q24 Press Release as stating that "[w]e are pleased with our progress in the first quarter as evidenced by strong results in important [key performance indicators]" and that "[w]e continue to make bold moves to transform our company for the future as we position ourselves to take full advantage of the opportunities ahead."

106.    Regarding the Company's Networks segment, the 1Q24 Press Release stated the following, in relevant part:

> · Networks operating expenses decreased 8% ex-FX to $3,006 million compared to the prior year quarter. The AT&T SportsNet exit favorably impacted the growth rate by approximately 300 bps[.]
> · Costs of revenues decreased 8% ex-FX, primarily driven by the AT&T SportsNet exit, the allocation of U.S. sports costs to DTC, as well as lower general entertainment content expense. These benefits were partially offset by the timing of domestic sports rights expense, unfavorable inflationary impacts in Argentina, and higher election expenses. The AT&T SportsNet exit favorably impacted the growth rate by approximately 300 bps.
> · SG&A decreased 8% ex-FX, primarily driven by lower overhead expenses.

107.    The same day, the Company held an earnings call with analysts and investors to discuss its financial results for 1Q24 (the "1Q24 Earnings Call"). During the call, Defendant Zaslav boasted of Defendants' alleged "confiden[ce]" in their assets, representing that "we're very confident in the strength of our assets and believe we will see both strategic and financial progress in the quarters ahead"; and that "we're more confident than ever in our assets and our playbook."

108.    Regarding the Company's negotiations with the NBA, Defendant Zaslav represented the following, in relevant part:

> We've enjoyed a strong partnership with the NBA for almost four decades. We're in continuing conversations with them now, and we're hopeful that we'll be able to reach an agreement that makes sense for both sides.

We've had a lot of time to prepare for this negotiation, and we have strategies in place for the various potential outcomes. However, now is not the time to discuss any of this. Since we are in active negotiations with the league and under our current deal with the NBA, we have matching rights that allow us to match third-party offers before the NBA enters into an agreement with them. With that in mind, please understand that this is as much as we're prepared to say about this topic today.

109.    Later on the call, Defendant Wiedenfels touted that the Company "continued [to] benefit from [*inter alia*] the [Company's] many initiatives to improve working capital, which we are still in the early innings of realizing", a "more disciplined and analytical approach to content investment and allocation", and "meaningfully lower cash restructuring costs."

110.    Regarding advertising trends, Defendant Wiedenfels also stated that "we did see sequential improvement [in] linear [markets] . . . in the first quarter" and "[t]otal company advertising in Q1 was down 7%, a sequential improvement of 300 basis points," and further represented that Defendants "expect another record quarter in Q2", which, "in part, reflects an increasingly more holistic portfolio approach to monetizing viewership on [*inter alia*] linear . . ., supporting our ability to offer our partners incremental reach and more customized ad[vertising] solutions spanning all platforms, particularly in the U.S."

111.    Later, during the Q&A portion of the call, an analyst asked Defendant Zaslav about the Company's "restructuring while navigating through the massive industry changes." In particular, the analyst asked "from a WBD point of view, what do you think the biggest surprises will be," as well as whether Defendants "can . . . give us your outlook for both sides, both [DTC] and linear." In response, Defendant Zaslav stated the following, in relevant part:

[F]or us, it's really two tiers. One is we got rid of a lot of content we didn't think was going to help us. But at the same time, we brought in a lot of great creatives and invested a lot of content. So it's, how do we run these businesses efficiently forreal free cash flow and drive for growth? But two, creative excellence. How do we have the best content?

In this past year, HBO had maybe its best year ever, and in addition to that, Warner Brothers Television has some of the best, highest quality TV production, and we're looking at our motion picture business now, which we're feeling really good about. It's number one to start the year, but we have a lot of great content. So I think it's that combination.

Great content, great creatives, fighting to tell the best stories on every platform, and then running it like a real business. Real free cash flow and real EBIT [earnings before interest and taxes], and I think those two will drive us for the future.

112.    In response, Defendant Wiedenfels stated the following, in relevant part:

I would . . . say that we're operating in a much more constructive environment this year than we did last year. So hopefully, that'll be supportive.

To your point . . . about the differentiation between D2C and linear, well really one of the things that's working very well right now is that convergence. The way . . . the team take our inventory to the market is fully harmonized now. It's across platforms, incremental reach. We're leaning in further.

* * *

Longer term, there is definitely more opportunity here. We have been very transparent about the significant monetization difference between linear and digital advertising. [Defendant Zaslav] talked about AI a couple of minutes ago. Certainly that should be a helper longer term as we think about our go-to-market here, so definitely some upside.

* * *

We're seeing how we're running the company fundamentally differently that's not reflected in our current and near-term financials, and I think that's going to be the surprises.

***May 9, 2024 Form 10-Q***

113.    Also on May 9, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for 1Q24 (the "1Q24 10-Q"). Regarding Warner's goodwill and intangible assets impairment analysis for 1Q24, the 1Q24 10-Q stated the following, in relevant part:

During the three months ended March 31, 2024, the Company performed goodwill and intangible assets impairment monitoring procedures for all of its reporting units and identified no indicators of impairment or triggering events. As of October 1, 2023 . . . the Networks reporting unit, which had headroom of 5%, . . . had fair value in excess of carrying value of less than 20%. The Company will continue to monitor its reporting units for triggers that could impact recoverability of goodwill. These triggers include, but are not limited to, continued decline in the Company's

market capitalization; affiliate and sports rights renewals, including the NBA, associated with the Company's Networks and DTC reporting units; [and] declining levels of global GDP growth and soft advertising markets in the U.S. associated with the Company's Networks reporting unit[.]

114.    Additionally, the 1Q24 10-Q contained substantively the same boilerplate risk warnings as discussed in ¶90 above regarding the Company's "invest[ment of] significant resources to acquire and maintain licenses to produce sports programming" and that "there can be no assurance that we will continue to be successful in our efforts to obtain or maintain licenses to recurring sports events or recoup our investment when the content is distributed." The 1Q24 10-Q also acknowledged that "our license for NBA programming is currently subject to renewal, and our exclusivity period with the NBA has expired" and, "[a]s a result, we face increased competition to license content from the NBA, which *could* result in significantly higher programming costs to us or a failure to maintain our license for NBA programming." (Emphasis added.)

115.    These statements were false and misleading for the same reasons as set forth in ¶91 above.

116.    The 1Q24 10-Q also continued to include boilerplate risk warnings with respect to the Company's potential future "recogni[tion of] . . . impairment charges related to goodwill and other intangible assets," while at the same time downplaying the same. Indeed, the 1Q24 10-Q stated the following, in relevant part:

We have a significant amount of goodwill and other intangible assets on our consolidated balance sheets. In accordance with U.S. GAAP, management periodically assesses these assets to determine if they are impaired . . . . The occurrence of certain events or circumstances *could* result in a downward revision in the estimated fair value of a reporting unit or intangible assets. For example, continued negative industry or economic trends, including the decline of traditional linear television viewership and linear ad[vertising] revenues, declining levels of global GDP growth and soft advertising markets in the U.S., disruptions to our business, inability to effectively integrate acquired businesses, execution risk associated with anticipated growth in our DTC products, underperformance of our content, failure to renew content licenses and distribution agreements, including

affiliate and sports rights renewals (including the NBA), unexpected significant changes or planned changes in use of the assets, including in connection with restructuring initiatives, divestitures and continued decline in our market capitalization **could** negatively affect our estimates of the fair value of our reporting units. When events or changes in circumstances such as this occur, we have needed to, and **may** in the future need to, write-down the value of our goodwill and other intangible assets. **If** we determine that our estimate of the fair value of a reporting unit is below the recorded value of that unit on our balance sheet, we **may** record a non-cash impairment loss for the goodwill. Any charges relating to the impairment of our goodwill and other intangible assets **could** materially adversely affect our results of operations in the periods recognized.

We consider all current information when determining the need for, or calculating, any impairment loss. However, future changes in events or circumstances, such as a continuation or worsening of the current negative industry and economic trends and the other events and circumstances described above, **could** result in decreases in the fair value of our goodwill and other intangible assets and require us to record additional impairment losses that **could** materially adversely affect our results of operations in the periods recognized.

117.    These statements were false and misleading for the same reasons as set forth in ¶93 above.

118.    In addition, the 1Q24 10-Q attached as exhibits substantively the same SOX certifications as discussed in ¶94 above, signed by Defendants Zaslav and Wiedenfels attesting to the accuracy of the 1Q24 10-Q.

119.    The statements in ¶¶84-89, 94, and 104-113 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the sports rights negotiations Warner had with the NBA were causing, or were likely to cause, Warner to substantially reevaluate its business and goodwill; (2) the Company's goodwill in its Networks segment had substantially lessened due to the difference between Warner's market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA; (3) due to the foregoing, Warner's likelihood of incurring billions of dollars in goodwill impairment charges significantly increased; and (4) as a result, the Defendants

had overstated the Company's overall financial and business prospects. As a result of the foregoing, Warner's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

120.    The truth emerged during after-market hours on August 7, 2024 when the Company published a press release announcing its financial results for the second quarter of the 2024 Fiscal Year ("2Q24") (the "2Q24 Press Release"). The Company reported, *inter alia*, disappointing revenue of $9.71 billion, which represented a 6.3% Y/Y decrease and missed consensus estimates by $360 million. Warner also reported a net loss of approximately ***$10 billion***, which resulted from a $9.1 billion non-cash goodwill impairment from the Company's Networks segment and $2.1 billion in other one-time accounting effects. Regarding the Company's reported net loss during 2Q24, the 2Q24 Press Release also revealed the following, in relevant part:

> Net loss available to [WBD] was $(10.0) billion, which includes a $9.1 billion noncash goodwill impairment charge from the Networks segment, as well as $2.1 billion of pre-tax acquisition-related amortization of intangibles, content fair value step-up, and restructuring expenses.
>
> · The goodwill impairment was triggered in response to the difference between market capitalization and book value, continued softness in the U.S. linear advertising market, and uncertainty related to affiliate and sports rights renewals, including the NBA.

121.    The same day, during after-market hours, the Company held an earnings call with analysts and investors to discuss its 2Q24 financial results (the "2Q24 Earnings Call"). During the call, Defendant Wiedenfels stated the following, in relevant part:

> Little more color on the Goodwill impairment. And to get straight to the point here, there is no one factor that is driving this impairment. So the way this works is obviously with the amount of goodwill that we have, there's a systematic process that we go through every quarter and we're monitoring for so-called triggering events.
>
> ***And this is clearly where a sports right discussion like the one with the NBA comes into play as a triggering event, which then compels us to re-evaluate our***

43

***business case*** in a strategic planning process with the latest assumptions, the best view of where the industry is and how we play in that field. ***And that's what then leads to evaluation, which in the second quarter happened to be $9.1 billion below what was on the books for the network segment.*** So it's really a full re-evaluation, not a response to one individual factor.

122.    On this news, the price of the Company's common stock fell $0.69 per share, or approximately 8.95%, from a closing price of $7.71 per share on August 7, 2024 to close at $7.02 per share on August 8, 2024.

## DAMAGES TO WARNER

123.    As a direct and proximate result of the Individual Defendants' conduct, Warner will lose and expend many millions of dollars.

124.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, and its CFO, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

125.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

126.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

127.    Additionally, these expenditures include, but are not limited to, compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company,

including amounts received pursuant to the Plan.

128.     As a direct and proximate result of the Individual Defendants' conduct, Warner has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

129.     Plaintiff brings this action derivatively and for the benefit of Warner to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Warner, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

130.     Warner is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

131.     Plaintiff is, and has been at all relevant times, a shareholder of Warner. Plaintiff will adequately and fairly represent the interests of Warner in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

132.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133.     A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Warner's Board consisted of the following twelve individuals: Defendants Zaslav, Di Piazza, Chen, Fisher, Gould, Lee, Lowe, Malone, Merchant, Price, and Yang (the "Director-

Defendants"), and non-party Daniel E. Sanchez (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to six of the twelve Directors that were on the Board at the time this action was filed.

134.    Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make the materially false and misleading statements alleged herein. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

135.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Warner to issue materially false and misleading statements. Specifically, the Director-Defendants caused Warner to issue false and misleading statements which were intended to make Warner appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

136.    Pursuant to the 2024 Proxy Statement, the Director-Defendants solicited shareholders to approve the amendment to the Plan to increase the number of shares they could receive for their own benefit. These financial incentives precluded the Director-Defendants from acting in the best interests of the shareholders, as they could not simultaneously request approval

of the amended Plan while also failing to provide shareholders with information in the 2024 Proxy Statement regarding the true state of the Company, including the truth about the Company's NBA negotiations. Their solicitation, which they materially benefitted from, and the approval of the proposal were based on materially false and misleading statements and omissions. The Director-Defendants are thus conflicted from considering a demand against each of the other Director-Defendants based on these circumstances as well.

137.    Additional reasons that demand on Defendant Zaslav is futile follow. Defendant Zaslav has served as a Company director since 2008 and as the Company's CEO and President since the closing of the Merger on April 8, 2022. Prior to the closing of the Merger, he served as Discovery's President and CEO from January 2007 until April 2022. The Company provides Defendant Zaslav with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, Defendant Zaslav was ultimately responsible for the Company's issuance of false and misleading statements during the Relevant Period. As the Company's highest officer, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, Defendant Zaslav solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders: (1) voting to reelect Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Zaslav also signed and made SOX certifications for the false and misleading 2023 10-K; and (2) approving the amended Plan, thereby allowing the Director-Defendants to materially benefit from the issuance of 125 million new shares which became

available thereunder. Moreover, Defendant Zaslav is named as a defendant in the Securities Class Action. For these reasons, Defendant Zaslav breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

138.    Additional reasons that demand on Defendant Di Piazza is futile follow. Defendant Di Piazza has served as a Company director since 2022. He also serves as a member of the Audit Committee. Defendant Di Piazza has received and continues to receive lucrative compensation for his role as a director as described above. In addition, Defendant Zaslav solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders: (1) voting to reelect Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Zaslav also signed and made SOX certifications for the false and misleading 2023 10-K; and (2) approving the amended Plan, thereby allowing the Director-Defendants to materially benefit from the issuance of 125 million new shares which became available thereunder. Defendant Di Piazza also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Di Piazza breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

139.    Additional reasons that demand on Defendant Fisher is futile follow. Defendant Fisher has served as a Company director since 2022. He also serves as a member of the Compensation Committee and the Governance Committee. Defendant Fisher has received and

continues to receive lucrative compensation for his role as a director as described above. In addition, Defendant Fisher solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders: (1) voting to reelect Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Zaslav also signed and made SOX certifications for the false and misleading 2023 10-K; and (2) approving the amended Plan, thereby allowing the Director-Defendants to materially benefit from the issuance of 125 million new shares which became available thereunder. Defendant Fisher also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Fisher breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

140.    Additional reasons that demand on Defendant Gould is futile follow. Defendant Gould has served as a Company director since 2008. He previously served as a director of Discovery Holding Company from 2005 to 2008 when it merged with Discovery. Defendant Gould also serves as Chair of the Compensation Committee and as a member of the Governance Committee. Defendant Gould has received and continues to receive lucrative compensation for his role as a director as described above. In addition, Defendant Gould solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders: (1) voting to reelect Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Zaslav also

signed and made SOX certifications for the false and misleading 2023 10-K; and (2) approving the amended Plan, thereby allowing the Director-Defendants to materially benefit from the issuance of 125 million new shares which became available thereunder. Defendant Gould also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Gould breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

141.    Additional reasons that demand on Defendant Lowe is futile follow. Defendant Lowe has served as a Company director since 2023 and previously served as a Company director from 2018 to 2022. He also serves as a member of the Audit Committee and the Compensation Committee. Defendant Lowe has received and continues to receive lucrative compensation for his role as a director as described above. In addition, Defendant Lowe solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders: (1) voting to reelect Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Zaslav also signed and made SOX certifications for the false and misleading 2023 10-K; and (2) approving the amended Plan, thereby allowing the Director-Defendants to materially benefit from the issuance of 125 million new shares which became available thereunder. Defendant Lowe also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in

the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Lowe breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

142.    Additional reasons that demand on Defendant Malone is futile follow. Defendant Malone has served as a Company director since 2008. He previously served as CEO and Chairman of the Board of Discovery Holding Company from 2005 to 2008, when it merged with Discovery. Defendant Malone also serves as Chair of the Governance Committee. Defendant Malone has received and continues to receive lucrative compensation for his role as a director as described above. In addition, Defendant Malone solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders: (1) voting to reelect Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Zaslav also signed and made SOX certifications for the false and misleading 2023 10-K; and (2) approving the amended Plan, thereby allowing the Director-Defendants to materially benefit from the issuance of 125 million new shares which became available thereunder. Defendant Malone also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Malone breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

143.    Additional reasons that demand on Defendant Merchant is futile follow. Defendant Merchant has served as a Company director since 2022. He also serves as a member of

the Audit Committee and the Governance Committee. Defendant Merchant has received and continues to receive lucrative compensation for his role as a director as described above. In addition, Defendant Merchant solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders: (1) voting to reelect Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Zaslav also signed and made SOX certifications for the false and misleading 2023 10-K; and (2) approving the amended Plan, thereby allowing the Director-Defendants to materially benefit from the issuance of 125 million new shares which became available thereunder. Defendant Merchant also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Merchant breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

144.    Additional reasons that demand on Defendant Yang is futile follow. Defendant Yang has served as a Company director since 2022. He also serves as a member of the Compensation Committee. Defendant Yang has received and continues to receive lucrative compensation for his role as a director as described above. In addition, Defendant Yang solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders: (1) voting to reelect Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Zaslav also signed and made SOX certifications for the false and misleading 2023 10-

K; and (2) approving the amended Plan, thereby allowing the Director-Defendants to materially benefit from the issuance of 125 million new shares which became available thereunder. Defendant Yang also signed the false and misleading 2023 10-K. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Yang breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

145.    Additional reasons that demand on Defendant Chen is futile follow. Defendant Chen has served as a Company director since 2022. She also serves as a member of the Governance Committee. Defendant Chen has received and continues to receive lucrative compensation for her role as a director as described above. In addition, Defendant Chen solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders: (1) voting to reelect Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Zaslav also signed and made SOX certifications for the false and misleading 2023 10-K; and (2) approving the amended Plan, thereby allowing the Director-Defendants to materially benefit from the issuance of 125 million new shares which became available thereunder. Defendant Chen also signed the false and misleading 2023 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons,

Defendant Chen breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

146.    Additional reasons that demand on Defendant Lee is futile follow. Defendant Lee has served as a Company director since 2022. She also serves as a member of the Compensation Committee. Defendant Lee has received and continues to receive lucrative compensation for her role as a director as described above. In addition, Defendant Lee solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders: (1) voting to reelect Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Zaslav also signed and made SOX certifications for the false and misleading 2023 10-K; and (2) approving the amended Plan, thereby allowing the Director-Defendants to materially benefit from the issuance of 125 million new shares which became available thereunder. Defendant Lee also signed the false and misleading 2023 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Lee breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

147.    Additional reasons that demand on Defendant Price is futile follow. Defendant Price has served as a Company director since 2022. She also serves as Chair of the Audit Committee. Defendant Price has received and continues to receive lucrative compensation for her role as a director as described above. In addition, Defendant Price solicited the false and misleading 2024 Proxy Statement, which led to, *inter alia*, shareholders: (1) voting to reelect Defendants

Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Zaslav also signed and made SOX certifications for the false and misleading 2023 10-K; and (2) approving the amended Plan, thereby allowing the Director-Defendants to materially benefit from the issuance of 125 million new shares which became available thereunder. Defendant Price also signed the false and misleading 2023 10-K. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Price breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

148.    Additional reasons that demand on the Board is futile follow.

149.    Defendants Price (as Chair), Di Piazza, Lowe, and Merchant (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, the Audit Committee Defendants breached

their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

150.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

151.    Warner has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Warner any part of the damages Warner suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

152.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf

of the shareholders of the Company. Accordingly, demand is excused as being futile.

153.    The acts complained of herein constitute violations of fiduciary duties owed by Warner's officers and directors, and these acts are incapable of ratification.

154.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Warner. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Warner, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

155.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Warner to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

156.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**<u>FIRST CLAIM</u>**

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

157.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

158.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

159.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

160.    Under the direction and watch of Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, Zaslav, Di Piazza, Lee, and Yang, the 2024 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

161.    The 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) the sports rights negotiations Warner had with the NBA were causing, or were likely to cause, Warner to substantially reevaluate its business and goodwill; (2) the Company's goodwill in its Networks segment had substantially lessened due to the difference between Warner's market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA; (3) due to the foregoing, Warner's likelihood of incurring billions of dollars in goodwill impairment charges significantly increased; and (4) as a result, the Defendants had overstated the Company's overall financial and business prospects. As a result of the foregoing, Warner's public statements were materially false and misleading at all relevant times.

162.    In exercise of reasonable care, Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, Zaslav, Di Piazza, Lee, and Yang should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the re-election of Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board and the approval of the Plan.

163.    As a result of Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, Zaslav, Di Piazza, Lee, and Yang causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) ratify the appointment of PricewaterhouseCoopers LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3)

approve, on an advisory basis, the compensation of the Company's named executive officers; and (4) approve the Plan.

164.    The Company was damaged as a result of Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, Zaslav, Di Piazza, Lee, and Yang's material misrepresentations and omissions in the 2024 Proxy Statement.

165.    Plaintiff, on behalf of Warner, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

166.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

167.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Warner's business and affairs.

168.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

169.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Warner.

170.    In breach of their fiduciary duties owed to Warner, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the sports rights negotiations Warner had with the NBA were causing, or were likely to cause, Warner to substantially reevaluate its business and goodwill; (2) the Company's goodwill in its Networks segment had substantially lessened due to the difference between Warner's market capitalization

and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA; (3) due to the foregoing, Warner's likelihood of incurring billions of dollars in goodwill impairment charges significantly increased; and (4) as a result, the Defendants had overstated the Company's overall financial and business prospects. As a result of the foregoing, Warner's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

171.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

172.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

173.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

174.    These actions were not a good-faith exercise of prudent business judgment to

protect and promote the Company's corporate interests.

175.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Warner has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

176.   Plaintiff, on behalf of Warner, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

177.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

178.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Warner.

179.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Warner that was tied to the performance or artificially inflated valuation of Warner, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

180.   Plaintiff, as a shareholder and representative of Warner, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

181.   Plaintiff, on behalf of Warner, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

182.   Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

183.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Warner, for which they are legally responsible.

184.    As a direct and proximate result of the Individual Defendants' abuse of control, Warner has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

185.    Plaintiff, on behalf of Warner, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

186.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

187.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Warner in a manner consistent with the operations of a publicly held corporation.

188.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Warner has sustained and will continue to sustain significant damages.

189.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

190.    Plaintiff, on behalf of Warner, has no adequate remedy at law.

**SIXTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

191.    Plaintiff incorporates by reference and realleges each and every allegation set forth

above, as though fully set forth herein.

192.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

193.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

194.    Plaintiff, on behalf of Warner, has no adequate remedy at law.

## SEVENTH CLAIM
**Against Defendants Zaslav and Wiedenfels for Contribution Under Sections 10(b) and 21D of the Exchange Act**

195.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

196.    Warner and Defendants Zaslav and Wiedenfels are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Zaslav's and Wiedenfels's willful and/or reckless violations of their obligations as officers and/or directors of Warner.

197.    Defendants Zaslav and Wiedenfels, because of their positions of control and authority as officers and/or directors of Warner, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Warner, including the wrongful acts complained of herein and in the Securities Class Action.

198.    Accordingly, Defendants Zaslav and Wiedenfels are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

199.    As such, Warner is entitled to receive all appropriate contribution or indemnification from Defendants Zaslav and Wiedenfels.

### **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Warner, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Warner;

(c)    Determining and awarding to Warner the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Warner and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Warner and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop

and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2.  a provision to permit the shareholders of Warner to nominate at least six candidates for election to the Board;

      3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

    (e)    Awarding Warner restitution from the Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: December 20, 2024

Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*_____
Timothy Brown
Elizabeth Donohoe
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
       edonohoe@thebrownlawfirm.net

66

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Anand Roy, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 19__ day of December, 2024.

DocuSigned by:

*Anand Roy*

241669D16B9A4F5...

Anand Roy